Good morning, Your Honors. May it please the Court, my name is Matt Stevenson. I represent the appellant, Christine Earl, who is in courtroom today, sitting in the back row there. I too would like to reserve a couple of minutes for rebuttal, if possible. I want to start by saying what kind of case this is. It isn't the kind of case that might typically come before you, which is where there is a collection of evidence and the two sides have competing explanations for the interpretation of that evidence. And the question before the District Court was whether plaintiff's explanation had sufficient substance to survive summary judgment. This case is distinctive in this way. Plaintiff offered four different kinds of evidence of pretext. The defendant offered no explanation for a different interpretation of any of those four kinds of evidence. So, specifically, there was evidence offered about violations of company policy in the termination of Ms. Earl. The defendant's position was that the explication of the policy as evidenced in our papers through the admission of the head of human resources, Bob Burns, was not the policy. It's a simple denial. That's not the policy. We're giving you a different interpretation of the policy by somebody else. But they don't reconcile at any point in their papers, at any point before the District Court, how the two interpretations of policy, one from the senior most HR person and his subordinate, the person he mentored, could be so radically different. As another example, with respect to the comparator evidence, there are three different comparators that were offered to the District Court and before this Court. People that were younger, substantially younger than the plaintiff, and who were treated more favorably for, in much more egregious violations. Now, one of the interesting points, it seemed to me, in the way that this was argued, and then, I think, decided by Judge Damrell, was that under the statute, this is a FIHA case. It is. Anyone over age 40 is within the protected class. Yes. And as I understand what Judge Damrell did was he said, well, if you're comparing to someone who's in the protected class, even though younger than your plaintiff, it doesn't account for purposes of your cause of action, that that other person, younger but within the protected class, might have been treated more favorably. Do you agree with that treatment? I agree that that's what the judge at the District Court level did. I believe that's absolutely incorrect. Because? Because the Supreme Court has dealt with this very issue. They've made a distinction between what constitutes age discrimination and how different it is from other kinds of discrimination. The reason it's different is because in age discrimination, it's a gradual transition. We all hope to enter the period of life where we can be subject to age discrimination. That is, we all hope to get over to 40 years old. And do you get to a certain age, and I've been there for a while, 40 looks like a kid. Oh, I'm already there, too. Yeah, okay. No. For me, it's 35, but I sympathize. Yeah, okay. So the issue is, those age discrimination statutes protect people from age discrimination. What they protect is that you're not discriminated against on the basis of your age, and they have chosen to represent, to protect people over 40. It does not mean that everybody over 40 is of the same class, in the sense that they're all subject to the same kinds of discrimination. In O'Connor and in the subsequent case, the General Dynamics case, both of which are cited in the brief, the Supreme Court makes the point that by far the more telling indicia of discrimination is when you treat somebody older, different than you treat somebody who's substantially younger. It doesn't matter. In fact, the Supreme Court is quite explicit. It doesn't matter that the person that you're treating more favorably is 40 or older. It's just that they're substantially younger than the person you're subjecting to discrimination. That's what suggests discrimination, that you're discriminating somebody against somebody on the basis of their older status, not just on the basis of the fact that they're over 40. 40 just defines the protected class. Now, here's my problem with your side of the case. We have a series of violations of company policy, twice, I think, leaving gifts at unattended places. The last one, from the company's standpoint, I agree with the characterization, but from the company's standpoint, it's kind of the straw that breaks the camel's back, that is to say, entering incorrectly the address so that the technician then shows up at the wrong address on that street, even though And to some extent, although I don't think it was emphasized in Judge Damrell's order, attitude. I mean, how does this happen? She says, magic. Well, okay. If I'm the supervisor and somebody, and I'm after somebody for having made a mistake, and they respond, magic, I say, oh, come on, let's solve it. Or no big deal. Yeah. So it seems to me that if I didn't look at the comparisons, there's, you know, there's it's an at-will employment arrangement. Right. There's grounds to dismiss. And I don't see just absolutely compelling evidence of unequal treatment. There's some suggestion, but, boy, help me out as to how much more favorably others who are comparably sort of either making mistakes or deliberately ignoring policy are treated. Okay. I'd like to address that in two ways. One is, initially, the only reason given for her termination was that she signed the wrong house in Texas. There was no conjunction of that event with the prior incidents. It's also important to know that those prior incidents, although they're greatly emphasized in the brief by defendant, as they naturally would be, are of very little consequence. And we know that because the only consequence to her is the lowest form of non-disciplinary documented verbal warning. It's a dip. A dip is not an extraordinary event. It doesn't even rise to the level of discipline. And we have testimony from the supervisor that after the dip was issued, she monitored her behavior and had no further problems. In fact, her situation, her conduct, to the extent there was any issue related to the dip, had improved to the point where no further dip was issued and she was actually chosen to be sent to Texas. I know that the brief you say, chosen to be sent to Texas, was, in your view, an indication that they thought highly of her. How do I know, and I apologize to Texas, how do I know that that wasn't a punishment? Well, I don't want to get into a dispute about the relative merits of our state, so I'm going to try to artfully dodge that question, but let me say this. When you're selected to go to another area to help out, whether it's Texas or New Hampshire, it's because you have met, you're producing satisfactorily and you are believed to be somebody who can be helpful to remedy the problems in that particular area where you've been requested, Texas or otherwise. Because she was sent to Texas, she was sent to New York. In fact, I think the problem with the wrong address took place in New York. Yes, that's right. So, to get back to the comparators, you expressed some concern that the other people against whom she was being compared didn't necessarily evidence much more significant problems than the ones that she had. Or that their treatment was not just strikingly more favorable, yeah. And I think if you look at the record, it's absolutely astounding, actually, how much more favorable it was. For example, there's this person 33071, a person in their 30s. They understand now, the plaintiff is disciplined and terminated for signing one wrong house in a 13-year career, once. 33071, who's in her mid-30s, in May of 2005, she signs a wrong home. A wrong home is actually installed and de-installed because it actually resulted in corrupted data. This is the big bugaboo that Nielsen's concerned about. Seven months later, oh, and for that violation, she's given a dip, a non-disciplinary dip, the lowest level. Seven months later, or I'm sorry, in 1206, she fails to verify an address properly, which is exactly the thing that Ms. Earle is being accused of in this case, and signs the wrong home again. That is, in this case, she signed a home where the criteria don't match the basics, the basic, which means that it necessarily means that the data that's collected from there is corrupted because it doesn't match the requirements of the basic unit that's been identified as Nielsen's critical. For that, she receives no consequence at all. The second time, she's signed the wrong house. On 308, she signs two wrong homes, signs two wrong homes that don't meet the criteria required of the basic, which Jim Sawatzky, the head of HR who testified as the person most knowledgeable, says will result, could result in corrupted data. For that, she's placed on a pip. So there are four instances, as opposed to my client's one. The other two people are very similar. 36082, a person in her early 40s, on 305, signs the wrong home, is given a verbal warning, not even a documented dip. Months later, signs another wrong home. Months later, signs another wrong home. The consequence of that, this is one that gets installed and results in corrupted data. No consequence at all. Not even a verbal warning. Two weeks after that, so this is three wrong homes in a year, all around the same time period, signs another wrong home and is given a pip. So radically different than the conduct that Ms. Earle is responsible for. The last example is the best example. 46432, a man 45 years old. This man is, there's a long documented history of very serious policy violations, including lying on his timesheets, taking exorbitant overtime, repeatedly signing the wrong house. This happens time and time again. Signs another wrong home and is placed on a dip, despite this long history of other complaints. Now this is the person, interestingly enough, that leads to the second and perhaps the most compelling element of our claim, which is that there is a policy, as stated by Mr. Burns, the head of HR and the person who is defined by Mr. Sawatsky as the definitive source of knowledge, that says you can't, our policy is that you don't fire anybody without putting them on a pip. So when he's presented with this 46432 and all the errors that he's committed and a request from a manager, I need to fire this guy, in exactly the same time frame as Ms. Earle was fired. The response from the head of HR is, we don't fire people without putting them on a pip. They put him on a pip, he signs a wrong home again, and now he's terminated. So I hope I have explained to you that these three comparators in each case engage in much more egregious conduct. Now of those three, is the last the only one who is over 40? The first one is under 40. The second one is under 40 when they first commit their error and then transition to 40 for the subsequent errors. The last one is in their early to mid 40s. Okay, so the last one is clearly disregarded for purposes of comparison by the district judge, rightly or wrongly. Rightly. Yeah, okay. But I would argue, I understand the argument. Let's hear from the other side. We've taken you over, but we'll give you a minute to respond. Thank you very much. Thank you. Good morning. Pleased to court, Matthew Ruggles for Defendant Nielsen, Media Research. Your Honor, I want to address several of the things Mr. Stevenson talked about. First, the discipline policy. The discipline policy, which we stated in our brief, does not specifically require a written warning or any particular procedure prior to termination. The evidence was that customarily Nielsen Media Research provided a written warning to the employee prior to termination. In this case, it's undisputed that Ms. Earl received a written warning several said that if she did not continue to comply with Nielsen's mandatory policies regarding accuracy of entering data and collecting data, that she would be disciplined further. The evidence is not that a PIP is required. The evidence from Yeah, but the question is not what's formally required. The question is, you know, is there discrimination between this person, Ms. Earl, and others who are younger? Yes. Well, whether there is, whether she is similarly situated to people outside of her protected class. Well, that's the, now I want to come back to that question. Well, you heard the exchange here in terms of comparators. Is it your position that anyone who is over 40 and therefore within the class is because that person's over 40 simply ineligible for comparison? Yes. Why is that? Because every single published decision says that the comparators must be outside the protected class for the issue of pretext, including every single decision published by the Ninth Circuit. There is not one single decision in any district court or any circuit court that says O'Connor, that issue in O'Connor, can be applied at the pretext stage. And there's a reason for that. Because the standard is different. At the prima facie case I think I want to go back and reread all those cases because that doesn't make any sense to me. Meaning, let's say we've got somebody who's 65 years old and somebody else who's 41. And the person who's 41 years old does all kinds of terrible things, should be fired on any normal universe. The person who's 65 years old does one bad thing and is fired. And you say, I can't make that comparison to try to figure out whether or not this person was fired at 65 because of age. I mean, that just doesn't make any sense to me. Well, Your Honor, my position is that the law in the Ninth Circuit is that comparators must be outside the protected class. Even in cases where age is the allegation, that is stated as the standard. Now, there is one... You see, protected class in some circumstances, it really doesn't make any difference in terms of degree. I mean, if we're talking race, okay, I am black and my comparators are black. But age is a relative proposition. And I think in our ordinary human experience, somebody who's 65 is quite different from somebody who's 41, even though under law, they may both be protected. If I'm trying to figure out motivation of the person who's terminating, a 24-year gap seems to me... I mean, how can I possibly ignore that? There is no question that that substantially younger person can be used to create the inference of discrimination under the first stage of McDonnell-Douglas for the prima facie case. We do not dispute that. And we said that at the hearing at the District Court. But there is at least one case, the Simpson v. K. Jewelers, which is 142 F. 639 in the Third Circuit. A similarly situated person... How that similarly situated analysis is done at the prima facie case versus the pretext stage. At the pretext stage, under Burdine, it's a new level of specificity. It has to be specific and substantial. When we're at the prima facie case, it's just replaced by a substantially younger person. That is not enough to survive summary judgment unless that explanation also questioned the veracity of the employer's reason. And in this case, it's absolutely undisputed that she violated all those policies. Yeah, but it seems to me, and I'll give you a chance to say that he's misdescribed the underlying facts as to the... I'll choose the last comparator. It seems to me that there's substantially different treatment. Whether it's based on age is a different question, but it sounds as though she was treated much less favorably than this man in his early 40s. Do you disagree with that? I disagree that they are similarly situated, Your Honor. No, I'm asking you a different question. I'm asking you whether she was treated, the plaintiff was treated much less favorably than the man in his early 40s. Which comparator? Third. You're discussing... They've all got numbers. Yeah, yeah. It's the 4-4. Well, they were both terminated. Right. Ultimately. Right. But they didn't commit the same policy violation. So I don't... A termination is the ultimate decision that the employer can make, but I guess I'm not understanding... She was terminated, and the other one was terminated, too. Right. But he seems to have been terminated only after he did a lot worse things, and he's terminated with a different process, and so on. Yes. Here's the problem with that analysis. You're saying he did worse things. The court is not supposed to weigh the reasons. The issue is, how did the employer consider those qualifications? I'm... I want to make clear. This is how Nielsen might consider those things. Right. There is no evidence. That's not... That's Nielsen's business. Right. This may be very serious to Nielsen. This may be not particularly to Nielsen. I just take that on faith. Right. And the issue is, signing the wrong home is not the same violation that the plaintiff committed. She enrolled the wrong home for equipment installation. In other words, she signed up that house and wrote down that it was that house. Right. That's a very serious violation, because Nielsen Media Research is a statistics company. They need to know who's watching what TV. Everyone's heard of that. If we... If it finds out that... If the public finds out that Nielsen's statistics are no good, the value goes down immediately. But the way that she did it sounds as though... I mean, she had two addresses, and she makes a... Basically, it's a sort of... It's almost an entry... Data entry mistake. It's not as though she says, listen, I need to make my numbers this year, and if I don't get another house, I'm in trouble. Therefore, I'm deliberately going to go out and sign this house. No, she just makes a mistake. And when the installer comes out and says, hey, I'm going to... Here to install, the mistake is discovered. Well, there's no doubt she made a mistake. Yeah, yeah. But was she the mistake? But it doesn't sound as though she did anything other than make a sort of a data entry mistake. This is not sort of deliberate. I need to make my numbers, and I'm going to cheat. Well, I'm not saying that she was cheating. No one said that she was cheating, or that she was trying to make her numbers, or anything other than... She didn't verify the address continuously. Remember, Nielsen's... But she really made a mistake. There's no question about that. No, no, but she didn't make a mistake just in data entry. She also filled out the... The agreement. Nielsen has an agreement with each family. She filled that out incorrectly, too. She would put the wrong address. When it came down to her deposition, she claimed, well, the person was speaking French, and I didn't understand her. She had an accent. But there's a policy on that if you do not understand. You're supposed to get someone out, and they have people trained in every language to come and talk. She did not do that. And the reason she didn't is because of her attitude. She said, just change it in the MSM. Big deal. I left the spec... I didn't use the spec map. Magic. Using the spec map is one of the reasons why they do that. So you don't make the error that she eventually made, which was a data entry. It was data entry. She did enter it wrong. But that's because she put it wrong on all her forms. What do we make of the argument from your adversary that she was told that she was fired for this one thing? Do you agree that she was fired only for this one last thing? That was the, as you say, the straw that broke the camel's back. But Nielsen Media Research has never said that that was the only reason for her termination. In fact, it was undisputed in district court that the reason for her termination was enrolling the wrong home for equipment installation in connection with all of her prior discipline. She says, she says, that was the reason they gave me. But that is not, there is no case that talks about the reason the plaintiff gave. It's just like, it's a similar principle. To beat summary judgment, the plaintiff cannot say, my performance was good. An employee's self-evaluation of their performance is insufficient to beat summary judgment. She could have just said, this error is no big deal, like she did when it happened. And so that doesn't create a material dispute of fact. So quizzing other employees about what was the reason she was terminated and finally getting somebody to say, well, she was terminated for starting the wrong home, doesn't dispute it because we've always, always consistently said, it was for what happened in Texas, plus her prior discipline, plus the testimony from Sally Dollar did reveal that she and Lisa LaLama did discuss the prior instances of, the prior instances of misconduct with Ms. Earl. And then, and then Mr. Stevenson asked, was the only reason she told you was starting the wrong home? And she said, yes, but that's a normal exchange between Lisa LaLama and Sally Dollar. Yeah, we fired her for that final mistake. Okay. Thank you. Thank you very much. We took you over, but we'll give you a minute to respond. One minute. The issue about the reason she was given for her termination are not just simply the plaintiff's recasting of the reasons. She testified that Dollar told her the reason was simply because of the house. Dollard testified that the sole reason for her termination was because of the house. And Dollar testified that when she talked to LaLama, LaLama said the sole reason she was being terminated was for the house. That's a material difference in the explanation because LaLama also testified that had it just been the house and not the other events, she would not have been terminated. That makes that a material difference that supports our claim for shifting rationales. In terms of this issue about things being the same policy violation, this is simply a manufactured argument that happens in the course of litigation. And there are lots of facts to support that. And we've cited them in the briefs. You've got admissions from Jim Suwatsky. He's produced all these documents as same or similar violations. And that collection of documents that we have represent Nielsen's view about what same or similar violations are. They defined it. Okay. Okay. Thank you very much. Thank both sides for your arguments. Earl versus Nelson. Nielsen Media Research, submitted on the briefs.
judges: Hug, Reavley, Fletcher W.